# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| REVEREND RONNIE FULLER,<br><br>      Plaintiff,<br><br> v.<br><br>GEORGIA DEPARTMENT OF CORRECTIONS; COMMISSIONER TYRONE OLIVER, in his official capacity; ASSISTANT COMMISSIONER OF HEALTH SERVICES RANDY SAULS, in his official capacity; STATEWIDE MEDICAL DIRECTOR DR. MARLAH MARDIS, in her official and individual capacities; former STATEWIDE MEDICAL DIRECTOR DR. SHARON LEWIS, in her individual capacity; CENTURION OF GEORGIA, LLC; HEALTH SERVICES ADMINISTRATOR GILBERT NOE, in his official and individual capacities; and Does 1 through 20, inclusive,<br><br>      Defendants. | CIVIL ACTION NO. _____ |

**<u>COMPLAINT</u>**

**INTRODUCTION**

1.      The Georgia Department of Corrections ("GDC") has needlessly and cruelly delayed access to necessary medical care and reasonable accommodations for Reverend Ronnie Fuller, a transgender man housed by GDC, in violation of the Eighth and Fourteenth Amendments of the U.S. Constitution and federal disability law.

2.      GDC long ago determined that Rev. Fuller was entitled to gender affirming care. Rev. Fuller first requested a subcutaneous mastectomy—or "top surgery"—more than seven years ago. This surgery is medically necessary to treat Rev. Fuller's persistent and debilitating gender dysphoria. It took five years, and numerous grievances, before GDC medical providers at his facility finally recommended that Rev. Fuller receive the requested surgery. Nurse Practitioner Jones, ("NP Jones"), Rev. Fuller's then-treating clinician, evaluated him and determined that he needed surgery. After Rev. Fuller cleared the mental health evaluation required by Randy Sauls, GDC's Assistant Commissioner of Health Services, and was found competent to have surgery, Nurse Jones submitted a surgical consult request to GDC in October 2022.

3.      Nothing has happened since then. GDC has not provided a surgical consult or otherwise made any progress toward meeting Rev. Fuller's medical needs,

all while Rev. Fuller continues to suffer emotionally and mentally. His gender dysphoria causes him anxiety, depression, and sleeplessness, and sometimes makes him unable to eat. Since July 1, 2024, Defendant Centurion of Georgia, LLC ("Centurion"), GDC's contracted medical provider, has refused to provide Rev. Fuller with a surgical consultation.

4.     There is no justification for GDC's delay except that, as the medical provider who recommended the surgery informed Rev. Fuller, GDC "won't want to pay for it."

5.     GDC is denying Rev. Fuller critical and medically necessary care—despite its own providers' recommendations for Rev. Fuller to receive that care—because of GDC's unconstitutional blanket ban on providing gender-affirming surgeries to transgender people in its custody.

6.     GDC's refusal to act is an unconstitutional delay in providing necessary medical care as it effectively amounts to a denial of necessary medical care, and thus a violation of the Eighth Amendment and federal disability law.

7.     The procedure at issue is a common one, used both for transgender men and for women with breast cancer. Rev. Fuller is aware of women in Lee Arrendale State Prison ("Arrendale") and Pulaski State Prison ("Pulaski") who received a subcutaneous mastectomy to treat their breast cancer. On information and belief, those women also received feminizing chest reconstruction surgery after their cancer

treatment to restore their breasts to their pre-mastectomy size and shape. If cisgender women can receive surgeries after their cancer treatment to have bodies that fully express their gender, then transgender people seeking treatment for their gender dysphoria—also a serious medical condition—should similarly be provided with the same treatment without undue delay.

8.     To prevent Rev. Fuller from accessing the same surgery that women can receive is to discriminate against him on the basis of sex—specifically his gender identity—and thus to deny him equal protection under the United States Constitution.

9.     Rev. Fuller respectfully requests that this Court order GDC to immediately provide Rev. Fuller with the medically necessary care to which he is entitled.

## JURISDICTION AND VENUE

10.     This action arises under 42 U.S.C. § 1983, the Eighth Amendment of the U.S. Constitution, the Fourteenth Amendment of the U.S. Constitution, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), and the Rehabilitation Act, 29 U.S.C. § 794.

11.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)–(4).

12.     Venue lies in the Northern District of Georgia and in the Atlanta division pursuant to 28 U.S.C. § 1391 and Local Rule 3.1. Most of the events giving rise to the claims in this action took place in Arrendale, a facility in this District. It is also the location where the majority of Defendants are employed and the site for the offices of Centurion.

## PARTIES

13.     Plaintiff Rev. Ronnie Fuller has been in GDC custody since 2003. He was ordained by the International Christian College and Seminary's correspondence program while he was incarcerated, on December 30, 2014. He was incarcerated at Arrendale from 2011 until June 2024. In June 2024, he was moved to Pulaski, where he is currently housed.

14.     Defendant GDC is a department of the State of Georgia that is responsible for Georgia's prisons, as well as the actions and decisions that take place within its penal and carceral system. Its central headquarters are located at 300 Patrol Road, Forsyth, Georgia 31029. Defendant GDC is a state government agency and is therefore a public entity within the meaning of the ADA and the Rehabilitation Act. At all relevant times, Defendant GDC was a recipient of federal financial assistance and therefore is subject to the Rehabilitation Act.

15.     Defendant Tyrone Oliver is the current Commissioner of GDC and is responsible for the overall administration of GDC correctional facilities, including

Arrendale and Pulaski, and the training of all GDC correctional officers and administrative staff. As Commissioner, Defendant Oliver is responsible for all GDC policies. At all relevant times, Defendant Oliver was acting under color of state law. This suit is brought against Defendant Oliver in his official capacity.

16.    Defendant Randy Sauls is and was at all relevant times the Assistant Commissioner of GDC's Office of Health Services and reports to Defendant Oliver. Defendant Sauls is responsible for the provision and administration of medical care, the training of medical staff, and the enforcement of medical policy. He is an administrator of GDC and works closely with the medical administrators of third-party contractor Centurion. At all relevant times, Defendant Sauls was acting under the color of state law. This suit is brought against Defendant Sauls in his official capacity.

17.    Defendant Dr. Marlah Mardis is the current Statewide Medical Director for GDC. Defendant Mardis is responsible for overseeing the medical policies and services across GDC facilities, including Arrendale and Pulaski. At all relevant times, Defendant Mardis was acting under color of state law. This lawsuit is brought against Defendant Mardis in her official and individual capacities.

18.    Defendant Dr. Sharon Lewis was the Statewide Medical Director for GDC until April 1, 2024, when she was replaced by Defendant Mardis. Dr. Lewis was responsible for overseeing the medical policies and services across GDC

facilities. At all times relevant to this action, Defendant Lewis was acting under color of state law during her tenure as Statewide Medical Director. This lawsuit is brought against Dr. Lewis in her individual capacity for her actions during her tenure as Statewide Medical Director.

19.     Defendant Centurion provides all medical services for GDC through a contract that began on July 1, 2024. Because Centurion contracted with the State of Georgia to provide functions traditionally reserved for the state, this action is brought against Centurion as a government entity under 42 U.S.C. § 1983. Centurion and its employees are engaged in action under color of state law.

20.     Defendant Gilbert Noe is Centurion's Health Services Administrator at Pulaski. On information and belief, Mr. Noe is a member of Rev. Fuller's treatment team and has decision-making power regarding his gender-affirming care, including referring him for surgery, providing him access to items to aid in his social transition, and ensuring he receives adequate hormone therapy. At all times relevant to this action, Mr. Noe was acting under color of state law. This lawsuit is brought against Mr. Noe in his official and individual capacity.

21.     Rev. Fuller is not aware of the true names, identities or capacities of the defendants sued herein as Does 1 through 20, inclusive, and therefore sues said defendants by such fictitious names. Does 1 through 20 are members of Centurion's Gender Dysphoria Committee that has been tasked with reviewing Rev. Fuller's

case. Rev. Fuller is informed and believes that, at various relevant times, these Doe defendants participated in or otherwise were in some manner responsible for upholding and enforcing GDC's ban on providing gender-affirming surgery. Rev. Fuller will seek leave of the Court to amend this complaint to state the true names and identities of the factiously named Doe defendants once they are discovered.

## FACTUAL BACKGROUND

### Gender Dysphoria Is a Recognized Disability

22.    According to the American Psychiatric Association ("APA"), the term "[t]ransgender refers to the broad spectrum of individuals whose gender identity is different from their birth-assigned gender."[1] GDC regulations comport with the APA's definition, defining "[t]ransgender" as "[w]hen a person's gender identity (internal sense of being male or female) is different from the person's gender assigned at birth."[2]

---

[1] Am. Psych. Ass'n, Diagnostic & Statistical Manual of Mental Disorders 511 (5th ed. text revision 2022) [hereinafter DSM-5-TR]. The United States Supreme Court has defined a transgender person as someone "who was identified as [one sex] at birth but who now identifies as a [different sex]." *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020).

[2] GDC Standard Operating Procedures ("SOP") 507.04.68(III)(A).

23.    According to the DSM-5,[3] gender dysphoria is the "clinically significant distress or impairment in social, occupational, or other important areas of functioning" that arises from the "marked incongruence" between a transgender person's sex assigned at birth and their gender identity or gender expression."[4]

24.    In short, with gender dysphoria, the distress *is* the disability.[5]

25.    The accepted clinical standard of care for treating gender dysphoria, established by the World Professional Association for Transgender Health

---

[3] The DSM-5, published by the APA in 2013, made significant changes based on an updated understanding of the psychological disorders that relate to gender. *See* Am. Psych. Ass'n, Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013) [hereinafter DSM-5]. There are critical differences between gender dysphoria and an outdated diagnosis that is gender identity disorder. *See Williams v. Kincaid*, 45 F.4th 759, 766–69 (4th Cir. 2022) (explaining that gender dysphoria has come to mean something different than gender identity disorder). Most notably, gender identity disorder considered anyone whose gender identity did not match their sex assigned at birth as inherently ill. In contrast, gender dysphoria refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's sex assigned at birth. *Compare* Am. Psych. Ass'n, Diagnostic & Statistical Manual of Mental Disorders 577 (4th ed., text revision) (2000) [hereinafter DSM-IV] *with* DSM-5-TR at 513.

[4] DSM-5-TR at 513. This is the definition of gender dysphoria with which Rev. Fuller was diagnosed in or around 2017. There has been a revision to the DSM in 2022, and this Complaint will cite to the most recent version, DSM-5-TR, as the authoritative source on gender dysphoria. This definition, however, is unchanged in the newest version and thus does not impact any argument herein.

[5] *See Koe v. Noggle*, 688 F. Supp. 3d 1321, 1321 (N.D. Ga. 2023) (explaining that as demonstrated by the DSM-5, gender dysphoria "causes clinically important distress in the person's life" (citations omitted)); *see also Doe v. Ga. Dep't of Corr.*, 730 F. Supp. 3d 1327, 1346–1349 (N.D. Ga. 2024) (holding the ADA does not exclude gender dysphoria from its protection).

("WPATH"), the American Medical Association ("AMA"), and the APA, is, among other things, to enable a person to live consistently with their gender through counseling, hormone therapy, gender-affirming surgery, and the social and legal transition to the sex associated with a person's gender identity.

26.    According to the WPATH's most recent version of the "Standards of Care for the Health of Transgender and Gender Diverse People" ("WPATH Standards of Care"), "[m]edically necessary gender-affirmation surgery . . . [is] designed to align a person's body with their gender identity."[6] For individuals assigned female at birth, "[the efficacy of] gender-affirming chest surgery or 'top surgery' (i.e. 'subcutaneous mastectomy') . . . has been demonstrated in multiple domains, including a consistent and direct increase in health-related quality of life, a significant decrease in gender dysphoria, and a consistent increase in satisfaction with body and appearance."[7] Every major medical organization in the United States recognizes that surgery can be medically necessary to treat gender dysphoria.

27.    The WPATH Standards of Care are based upon a rigorous and methodological evidence-based approach. WPATH's recommendations are informed by a systematic review of evidence and an assessment of the benefits and

---

[6] E. Coleman et al., *Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S128 (2022) [hereinafter WPATH SOC-8].

[7] *Id.*

harms of alternative care options. The WPATH Standards of Care incorporate recommendations on clinical practice guideline development from the National Academies of Medicine and the World Health Organization.

### GDC's Blanket Ban on Gender-Affirming Care

28.    GDC has an established record of delaying or denying necessary medical care and services to transgender people in its custody who are diagnosed with gender dysphoria, including Rev. Fuller.

29.    GDC has been the subject of several lawsuits challenging this unconstitutional lack of care. At least two such lawsuits challenged GDC's former "freeze frame" policy, which prevented transgender people from accessing necessary hormone-replacement therapy ("HRT") unless they had a prescription from a community provider at the time of their incarceration.[8] The United States Department of Justice issued a Statement of Interest in one of these cases condemning blanket bans on necessary gender-affirming care, explaining that the

---

[8] *See Diamond v. Owens*, 131 F. Supp. 3d 1346, 1353 (M.D. Ga. 2015); Christina Alicia, *I'm a Trans Woman of Color in an All-Male Prison. I had to Fight for My Right to Gender-Affirming Care Behind Bars*, BUS. INSIDER (Mar. 31, 2023), https://www.businessinsider.com/trans-woman-of-color-male-prison-georgia-gender-affirming-care-2023-2.

Eighth Amendment requires that medical care should include individualized assessment and treatment.[9]

30.    On February 1, 2022, GDC promulgated Standard Operating Procedure ("SOP") 507.04.68 (Management and Treatment of Offenders Diagnosed with Gender Dysphoria). According to GDC, the "freeze frame" policy is no longer in effect.[10] The new policy provides that all people in GDC custody who "have been diagnosed with Gender Dysphoria will receive a current individualized assessment and evaluation."[11] In fact, "[t]he best foundation for the appropriate management and for avoiding inappropriate interventions is a prompt initial medical screening, and a referral to a psychiatric provider and/or psychologist for a thorough medical and mental health evaluation, following [sic] by a collaborative multidisciplinary team meeting to collaborate on an individual management plan."[12]

31.    This multidisciplinary team, according to the SOP, is "composed of medical, mental health, security and [Prison Rape Elimination Act ("PREA")] Coordinator's office, as well as any other staff deemed appropriate" and is formed within thirty days of a person's gender dysphoria diagnosis.[13] The multidisciplinary

---

[9] *See* Statement of Interest of the United States at 1–2, *Diamond v. Owens*, ECF No. 29, No. 5:15-cv-00050 (M.D. Ga. Apr. 3, 2015).

[10] *See* GDC SOP 507.04.68(IV)(C)(6).

[11] GDC SOP 507.04.68(IV)(C)(5).

[12] GDC SOP 507.04.68(IV)(A)(6).

[13] GDC SOP 507.04.68(IV)(B)(1).

team makes recommendations regarding housing, property items, shower arrangements, and any other relevant decisions and is tasked with reassessing the transgender person in custody at least every six months.[14] In addition, the SOP provides that the "offender's own views with respect to his or her own safety shall be given serious consideration."[15]

32.    According to GDC SOP 507.04.68, "[i]f a referral from Mental Health is made to Medical, a treatment plan will be developed" that uses "accepted standards of care . . . as a reference."[16] The treatment plan or denial thereof "must be approved by the Contract Vendor [currently Centurion] Statewide Medical Director and reviewed with the GDC Statewide Medical Director [a.k.a. Defendant Marlah Mardis, previously Defendant Sharon Lewis] and GDC Statewide Mental Health Director."[17]

33.    The policy specifies that HRT may be provided if the Statewide Medical Director and Statewide Mental Health Director deem it medically necessary.[18] The policy does not mention other forms of gender-affirming care.

---

[14] GDC SOP 507.04.68(IV)(B)(2), (6).
[15] GDC SOP 507.04.68(IV)(C)(1).
[16] GDC SOP 507.04.68(IV)(C)(3).
[17] GDC SOP 507.04.68(IV)(C)(4).
[18] GDC SOP 507.04.68(IV)(D)(1)(d).

34. GDC is not following this policy as to Rev. Fuller. Adherence to the policy is necessary to meet constitutional minimum standards. On information and belief, Rev. Fuller does not receive evaluations every six months and experiences extremely long delays in obtaining medically necessary care, including surgery.

35. Moreover, according to GDC SOP 507.04.10: "The contract vendor UM Medical Director or Nurse Analyst will review and make a determination regarding each consultation/procedure request within five (5) days of submission."[19] Thus, when a facility-level physician requests a consultation for surgery, Centurion must make a decision regarding the request within five days of the submission. No such determination has been made in this case, let alone within the five-day requirement.

36. Furthermore, GDC's treatment of Rev. Fuller raises the inference that GDC operates under a de facto blanket ban on gender-affirming surgery. No one has ever received gender-affirming surgery in GDC custody, despite many transgender people having made requests for this form of medically necessary care. By failing or refusing to provide Rev. Fuller with an individualized medical assessment conducted by a specialist in surgical care for transgender patients, GDC is preventing him from accessing gender-affirming surgery (a mastectomy) because it simply

---

[19] GDC SOP 507.04.10.

refuses to offer that type of medical care to anyone with gender dysphoria, regardless of medical necessity.

37.    Despite Rev. Fuller first requesting a mastectomy in 2017 and the medical determination by his treating healthcare professionals at GDC since at least October 2022 that such procedure is medically necessary, GDC still—nearly eight years later—has not approved Rev. Fuller's gender-affirming surgery or even provided him with a specialist consultation.

**Impact of GDC's Blanket Ban on Plaintiff Reverend Ronnie Fuller**

38.    Rev. Fuller is a 45-year-old transgender man who has been incarcerated at GDC facilities since 2003. Rev. Fuller was first incarcerated in Pulaski from 2003-2011, then he was transferred to Arrendale from 2011 to mid-2024. He is presently housed in Pulaski again.

39.    Rev. Fuller experienced symptoms of gender dysphoria before his incarceration. He always felt uncomfortable with his body and did not want to wear women's clothing. While he was unfamiliar with the terms gender dysphoria and transgender, Rev. Fuller knew he felt different. Rev. Fuller began inquiring about gender-affirming surgery before he was incarcerated.

**A. Hormone Replacement Therapy – Delayed Access**

40.    In or around April 2017, while incarcerated at Arrendale, Rev. Fuller had informed his mental health counselor that he was feeling depressed because he

hated his body. His counselor referred him to a GDC psychiatrist, who diagnosed Rev. Fuller with gender dysphoria. Immediately upon his diagnosis, Rev. Fuller requested HRT.

41.    On April 10, 2017, Rev. Fuller was evaluated by Dr. Monica Hill, then-Medical Director at Arrendale, who referred him to Dr. Anthony Mulloy, GDC's endocrinologist. According to Dr. Hill's notes, Rev. Fuller "saw Psychiatry who informed medical that patient has gender dysphoria and wants hormone [therapy]."

42.    On May 3, 2018, after waiting over a year to meet with Defendant Mulloy, Rev. Fuller grieved the delay. In his grievance, Rev. Fuller stated that his appointment with the endocrinologist kept changing while others—despite seeking appointments after Rev. Fuller—had received their consultations and actually began "receiving hormone shots." As a result of this delay and complete lack of "constitutionally required" treatment, Rev. Fuller experienced "extreme mental and emotional distress," per his grievance.

43.    After filing the grievance, Rev. Fuller was finally scheduled for this appointment in September 2018, a delay of a year and a half after he received his

referral, the first step in the pattern of GDC's refusal to provide Rev. Fuller care through delay.[20]

## B. Gender-Affirming Surgery

44.    GDC's pattern or practice of refusing to provide necessary care also impacts Rev. Fuller's surgical requests. Rev. Fuller waited nearly five years to be even recommended for the surgery he initially requested in 2017: a subcutaneous mastectomy, or "top surgery," to treat his gender dysphoria by bringing his chest into alignment with his gender identity.

45.    Despite his relentless self-advocacy, including appealing at every level and exhausting the medical grievance process as set forth by GDC, his facility's October 2022 recommendation for medically necessary surgical care has been ignored for twenty-seven months and counting.

46.    Such an inordinate delay is in stark contrast with other surgeries Rev. Fuller has received, for reasons other than treating gender dysphoria, including a hysterectomy and having fibroids removed. In those cases, after making a medical request at his facility, he was provided with a referral to a specialist relatively quickly and met the doctor in a reasonable time. Here, by contrast, he has been waiting for

---

[20] At time of filing, Rev. Fuller receives adequate hormone therapy and therefore does not allege any claims based on the past delay to receive care. But his treatment helps to show GDC's pattern of delay in treating his gender dysphoria.

years for review and approval by GDC to even schedule a meeting with the specialist.

47.    In 2017, Rev. Fuller initially requested top surgery from his mental health clinician, Ms. Loyal, who informed him that GDC administration would not pay for the surgery. Rev. Fuller explained to Ms. Loyal that the failure to receive top surgery was affecting his mental health.

48.    In 2018, when starting HRT, Rev. Fuller again lodged a request with Ms. Loyal for a mastectomy. Rev. Fuller then explained to Dr. Hill that he felt at odds with his body because of his breasts. Dr. Hill responded that she would attempt to inform GDC administration, but she said "they're probably going to deny it because they won't want to pay for it." On information and belief, during the relevant time period, senior leadership at GDC had notice of this total ban on providing medically necessary gender-affirming surgeries to trans individuals.

49.    Rev. Fuller fully grieved GDC's refusal to provide access to his medically necessary surgery in November 2018, March 2019, September 2020, and January 2021. Throughout these years, GDC officials responding to his grievances repeatedly and blithely asserted that its officials were providing him care in compliance with SOP 507.04.68.

50.    Rev. Fuller finally met with NP Jones on September 23, 2022—four years after initially requesting the surgery—to discuss his medical needs. NP Jones

documented that Rev. Fuller complained of the delay in receiving surgery. Specifically, Rev. Fuller expressed that despite telling Defendants "about the surgery for years," the delay has caused him to experience "great mental anguish," that his "anxiety and depression is great," and he feels "like a bearded woman."

51.    A month later, in October 2022, Rev. Fuller complained again to NP Jones about how he was being denied the mastectomy. Referring to GDC, NP Jones responded that "[t]hey aren't going to pay for that." Following his meeting with NP Jones, Rev. Fuller sent an email and letter to Defendant Sauls, GDC's Assistant Commissioner for Health Services, regarding his concern over the delay in receiving surgery.

52.    A week later, Rev. Fuller was called into the medical unit by Wellpath's Health Services Administrator at Arrendale, Mr. Gary Albin.[21] Mr. Albin guided Arrendale's medical staff to adhere to the policies and practices on providing medical care to Rev. Fuller and other trans people. According to Mr. Albin, Defendant Sauls wanted Rev. Fuller to be fully informed of what top surgery entailed and wanted to ensure that Rev. Fuller was mentally ready for the surgery. Mr. Albin

---

[21] Wellpath, LLC formerly contracted with GDC to provide medical care. Wellpath, LLC filed for bankruptcy and has not been named as a defendant in this suit. Similarly, this suit is not brought against anyone who was employed by Wellpath for their tenure as Wellpath employees. Instead, as the current medical provider for GDC, Centurion has assumed responsibility for the scope of Rev. Fuller's care and the issues raised in this Complaint.

sought clarification of what type of surgery Rev. Fuller was seeking. Rev. Fuller confirmed that he sought only top surgery, and Mr. Albin scheduled an appointment for Rev. Fuller to see Dr. Howard, a psychiatrist, to examine whether Rev. Fuller was mentally competent for surgery.

53.     In October 2022, Dr. Howard evaluated Rev. Fuller and determined that he was mentally competent and ready for the mastectomy. Dr. Howard forwarded his psychiatric evaluation and recommendation to Mr. Albin and informed Rev. Fuller that, from a mental health perspective, Rev. Fuller was approved for the mastectomy. Mr. Albin sent Dr. Howard's evaluation to Defendant Sauls.

54.     Mr. Albin also informed NP Jones that Rev. Fuller was cleared for top surgery from the psychiatric expert. NP Jones evaluated Rev. Fuller and assessed his need for top surgery. NP Jones determined that top surgery was medically necessary for Rev. Fuller. She therefore submitted a surgical consultation request in October 2022 to the GDC medical director, then Defendant Sharon Lewis. Defendant Lewis ignored NP Jones's consultation request, and so the request for follow-up stalled at the GDC level and nothing happened for several months.

55.     In January 2023, Rev. Fuller spoke with Mr. Albin directly. Rev. Fuller asked what happened after NP Jones submitted her surgical consultation request. Mr. Albin explained that in October 2022, NP Jones submitted a request to the GDC Utilization Management, which oversees all consult requests. Mr. Albin said he

would ask NP Jones to contact him again because Rev. Fuller was concerned about the delay. Mr. Albin said that the surgery had been approved at the prison level in October 2022, but that the final decision was pending with GDC's medical and administrative officials.

56.    Around the same time, NP Jones informed Rev. Fuller that the Gender Dysphoria Treatment Committee would be responsible for deciding whether Rev. Fuller could receive the mastectomy. NP Jones had been informed of this update from GDC's Utilization Management in response to NP Jones's email. GDC's Utilization Management instructed NP Jones not to submit another surgical consult request because they would let her know once they had made a decision. NP Jones did not explain the review process in any greater detail.

57.    Despite both Dr. Howard's mental health evaluation and NP Jones's individualized assessment of Rev. Fuller that determined he needed top surgery over two years ago, Rev. Fuller has not been provided with a specialist consult, surgical evaluation, or any further steps towards his access to this medically necessary surgery. GDC has also not provided Rev. Fuller with any clarity on the timeline or process for their decision.

58.    On February 25, 2023, Rev. Fuller grieved the consistent delays in accessing his recommended surgery. In his grievance, Rev. Fuller noted that despite

GDC's SOP 507.04 defining gender dysphoria as a serious medical need that may not be ignored, his "need for surgery is being ignored."

59.    While GDC purportedly "partially granted" Rev. Fuller's February 2023 grievance on March 20, 2023, it nonetheless placed Rev. Fuller under what has essentially been an indefinite pending status. Indeed, GDC responded that Rev. Fuller's surgery "has been approved on the facility level. Final approval is pending upper level medical team advisement outside of the facility."

60.    On March 22, 2023, GDC denied Rev. Fuller's grievance, asserting that "[m]edical staff have forwarded offender's information to appropriate outside facility. The determining decision is still pending as of 3.8.2023." Rev. Fuller appealed the denial on April 13, 2023, and GDC simply reiterated the same denial that a "decision" on his surgery was "still pending."

61.    Also on March 22, 2023, Rev. Fuller met with NP Jones and expressed his concerns that the consultation for a mastectomy had not yet been approved.

62.    On July 2, 2023, Rev. Fuller wrote a letter to the GDC Legal Department and explained that he had been approved at the facility level for surgery but that the decision had been stalled at the GDC administrative level, at that point for at least over eight months.

63.    On July 4, 2023, Rev. Fuller wrote another letter to Defendant Sauls detailing the delay in his critical medical care. Quoting GDC SOP 507.04.68, Rev.

Fuller asserted that continuing "to delay a decision on [his] receiving surgery represents a complete disregard for GDC policy and [his] medical and mental health needs." Because Defendant Sauls has allowed the recommendation for surgery to linger, on information and belief, he has adopted, enforced, and ratified a blanket ban on providing gender-affirming surgery.

64.     On or about July 17, 2023, Rev. Fuller filed an ADA Accommodation Request regarding the delay in receiving a surgical evaluation.

65.     On August 15, 2023, having heard nothing in response to the letters he sent earlier in the summer, Rev. Fuller sent a letter to GDC General Counsel Jennifer Ammons expressing concerns over the delay in receiving his medically necessary surgery. Rev. Fuller explained that he felt he was being given "the runaround."

66.     Rev. Fuller is aware of at least three women at Arrendale and Pulaski who received mastectomies to treat their breast cancer and who received breast reconstruction afterwards so their physical appearance matched their gender identity. And Rev. Fuller is also aware of a woman who received breast reduction surgery. On information and belief, after those women submitted medical requests, the requests did not need to be reviewed by a board or committee equivalent to the Gender Dysphoria Treatment Committee. Rather, the facility physician submitted a request, which was quickly approved, and the women received their surgeries without undue delay. He told General Counsel Ammons in his August 2023 letter

that GDC repeatedly told him his case was pending approval for prolonged months, while these women quickly received these surgeries. Rev. Fuller asserted, yet again, that the delay he had been experiencing had caused and continues to cause him harm "physically, mentally and emotionally."

67.    On or about August 16, 2023, GDC denied Rev. Fuller's ADA Accommodation Request, writing in the decision that neither "Gender Dysphoria, nor its treatment, is covered under ADA accommodations."

68.    Rev. Fuller sent a letter to the State of Georgia ADA Coordinator's Office on September 12, 2023, seeking clarification on GDC's claim that gender dysphoria did not fall under the ADA.

69.    On September 19, 2023, the State of Georgia ADA Coordinator's Office responded to Rev. Fuller's letter. It confirmed that gender dysphoria and treatment therefore are covered by the ADA, citing *Kincaid v. Williams*, 45 F.4th 759 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023), and the DSM-5's definition of gender dysphoria.[22]

70.    With the information provided by the State of Georgia ADA Coordinator's Office, Rev. Fuller filed another ADA Accommodation Request on September 25, 2023. Rev. Fuller explained that "[g]ender affirming top surgery is a

---

[22] *See supra* ¶ 23.

medical necessary procedure and this blanket policy that GDC and Wellpath have is causing me mental, emotional and physical anguish the longer they continue to deny me the surgery." Rev. Fuller did not receive a timely response to this Request.

71.    As a result, after waiting nearly two weeks to hear back, Rev. Fuller filed another ADA Accommodation Request on October 8, 2023. Therein, Rev. Fuller complained that he had requested a medically necessary procedure. He explained that this procedure was necessary so that he could "get closer to being whole." Rev. Fuller thus made clear that GDC's failure to provide him top surgery was preventing him from living a full life. Despite its necessity and urgency, Rev. Fuller said that GDC staff consistently responded that they "are checking into it," with no further details about progress or updates. Rev. Fuller further asserted, "When medical consults are submitted they are reviewed but none of them have to go before any special board yet gender dysphoria does. That is clear discrimination." He described the lack of individualized care as GDC's decision to adopt a "blanket policy when it comes to treatment of gender dysphoria" that is one of delay and denial.

72.    Having not received any of the care that was recommended and with no explanation for the delay, Rev. Fuller pursued his only recourse: he submitted another grievance on October 16, 2023. Rev. Fuller asserted that the delay in coming to a decision about his top surgery constitutes "deliberate indifference" and puts him

at substantial risk of serious harm. He wrote that some of these harmful effects include depression, anxiety, and mental, emotional, and physical anguish. He stated: "Having this gender-affirming surgery is medically necessary for my individualized treatment and this continuous delay in giving me a decision is causing greater harm to me."

73.    Since transferring to Pulaski, Rev. Fuller spoke with Centurion's Health Services Administrator Gilbert Noe sometime in or around September 2024 to ensure that his new treatment team at Pulaski, including Dr. Ramirez, the previous lead physician at Pulaski, knew about his pending recommendation for top surgery. Defendant Noe said he was going to look into it. But when Rev. Fuller checked in again with Dr. Ramirez, Dr. Ramirez said that Defendant Noe never talked to him about the pending recommendation.

74.    To date, Rev. Fuller has yet to receive a final decision from GDC, nor has he been afforded the ability to consult with a surgeon who would explain the details of any potential procedures. Further, since Centurion began providing medical services on July 1, 2024, none of the Centurion employees in Centurion's Gender Dysphoria Committee, Doe Defendants 1–20, who are responsible for the review of Rev. Fuller's surgery recommendation, have provided a final decision, a surgical consultation, or any other progress update to Pulaski staff to share with Rev. Fuller. GDC and Centurion have not provided any rationale for the delay.

75.    On December 17, 2024, Rev. Fuller's current physician in Pulaski, Dr. Ahmed, checked the medical system and informed Rev. Fuller that NP Jones's consult for his chest surgery is still pending in the system and has yet to receive a final decision. GDC and Centurion have yet to find a surgeon to conduct the consultation.

76.    In addition, none of the other trans men in Pulaski who have requested a gender-affirming surgical consult have received one. Rev. Fuller believes this is because of a total ban on providing gender-affirming surgeries. On information and belief, senior leadership at GDC and Centurion had notice of this total ban on providing medically necessary gender-affirming surgeries to trans individuals.

77.    GDC has made no apparent advancement towards resolving Rev. Fuller's request for surgery and no efforts to provide him with the care he needs. GDC has not set up an appointment with a surgical consultant or interviewed or evaluated Rev. Fuller further. The prolonged delay has been without justification.

78.    As a result of not receiving top surgery, Rev. Fuller has experienced significant emotional distress. He is agitated, anxious, and depressed, to the extent that the facility has offered to prescribe him medication to treat his conditions. Rev. Fuller has not accepted these prescriptions for fear of side effects. The emotional distress is causing Rev. Fuller sleep disruptions, sometimes worsening to the point

of not sleeping at all. Rev. Fuller has experienced the inability to eat as a result of his anxiety and mental distress.

79.    But Rev. Fuller is fearful of expressing too much anxiety, depression, or distress because it results in safe cell placement. A safe cell is a location to house imprisoned people where they are closely monitored to prevent suicide. Rev. Fuller was placed in a safe sell previously as result of his emotional state regarding his gender dysphoria. His experience was so terrible in that cell that he assiduously avoids them. He refuses to tell his counselors the full scope of his feelings because he cannot bear the thought of being placed in a safe cell again.

## CLAIMS FOR RELIEF

### Count 1

### 42 U.S.C. § 1983 – Eighth Amendment – Medical Deliberate Indifference – Injunctive Relief and Damages (Against All Defendants)

80.    A prison official violates the Eighth Amendment to the U.S. Constitution if he or she subjectively knew that an inmate faced a substantial risk of serious harm from a serious medical need and disregarded that known risk by failing to respond to it in an objectively reasonable manner, including by unduly delaying treatment.

81.    Rev. Fuller has been diagnosed with gender dysphoria.[23] Rev. Fuller's gender dysphoria is a serious medical need.[24]

82.    State actors for purposes of 42 U.S.C. § 1983 include agencies of the state. GDC is therefore a state actor, and so are its employees: Defendants Oliver, Sauls, Mardis, and Lewis.[25]

83.    Private entities constitute state actors under 42 U.S.C. § 1983 when they contract with the state to provide functions traditionally reserved to the state. Centurion is a state actor under 42 U.S.C. § 1983 because it contracts with GDC to provide mental health and medical services for GDC facilities.[26] Accordingly, Centurion's employees, including Defendant Noe and Doe Defendants 1–20, are also state actors.[27]

84.    Defendants employed by GDC—including Defendants Oliver,[28] Sauls,[29] Mardis,[30] and Lewis[31]—and Centurion—including Defendant Noe[32] and

---

[23] *See supra* ¶ 40.

[24] *See supra* ¶¶ 23–31.

[25] *See supra* ¶¶ 14–18.

[26] *See supra* ¶ 19.

[27] *See supra* ¶¶ 20, 21.

[28] *See supra* ¶ 15.

[29] *See supra* ¶¶ 51, 52, 63.

[30] *See supra* ¶¶ 17, 32.

[31] *See supra* ¶¶ 32, 54.

[32] *See supra* ¶ 73.

Doe Defendants 1–20[33]—actually knew Rev. Fuller had a serious medical need that posed a risk of serious harm to him without medically necessary treatment in the form of surgery. Rev. Fuller's gender dysphoria and history of physical and mental health problems as a result of the denial of medically necessary treatment were well-documented in his GDC medical records.[34] These Defendants therefore knew that Rev. Fuller required this care and that denying it would pose significant risks.[35]

85.    The failure of Defendants GDC, Centurion, Oliver, Sauls, Mardis, Lewis, Noe, and Does 1–20 to provide Rev. Fuller with medically necessary care for at least two years was in disregard of the serious risk of harm to Rev. Fuller and in direct contradiction to GDC's policies and the WPATH Standards of Care, the accepted clinical standards for gender dysphoria care. The decisions of Defendants Oliver, Sauls, Mardis, Lewis, Noe, and Does 1–20 to not respond to Rev. Fuller's requests for surgery with any additional steps or measures to review his facility's surgical recommendation are actions taken under state law.

86.    The decision of Defendants GDC, Centurion, Oliver, Sauls, Mardis, Lewis, Noe, and Does 1–20 to delay Rev. Fuller medically necessary care for 27 months and counting was based entirely on GDC's unconstitutional blanket ban on

---

[33] *See supra* ¶ 74.

[34] *See supra* ¶ 78.

[35] *See supra* ¶¶ 45–55.

gender-affirming surgery. This ban was based on nonmedical reasons—as shown by the remarks of Nurse Loyal,[36] Nurse Jones,[37] and Dr. Hill[38]—and was not linked to an individualized assessment of Rev. Fuller's medical needs, as putatively required by GDC SOP 507.04.68.

87.    GDC and Centurion are liable entities because a policy decision was either made or ratified by a policymaker from each entity. On information and belief, during the relevant time period, senior leadership at GDC and Centurion had notice of this total ban on providing medically necessary gender-affirming surgeries to trans individuals.[39]

88.    On information and belief, Defendant Sauls, Assistant Commissioner of Health Services for GDC—who works closely with Centurion and is responsible for the administration of medical care, the training of medical staff, and the enforcement of medical policy—adopted, ratified, and enforced GDC's blanket ban policy.[40]

89.    Defendant Mardis, as GDC Statewide Medical Director, and Defendant Lewis, as former GDC Statewide Medical Director, ratified and enforced GDC's

---

[36] *See supra* ¶ 47.

[37] *See supra* ¶ 51.

[38] *See supra* ¶ 48.

[39] *See supra* ¶¶ 36, 48, 50, 76.

[40] *See supra* ¶¶ 51, 52, 63.

blanket ban on gender-affirming surgery by unduly delaying Rev. Fuller's request for gender-affirming top surgery and denying or otherwise ineffectively responding to his subsequent grievance appeals to receive a surgical consultation.[41] Defendants Mardis and Lewis acted contrary to the recommendations of GDC's own providers that Rev. Fuller receive gender-affirming surgery. This violation is continuous and ongoing.

90.    Defendant Noe, as Health Services Administrator for Centurion, has refused to provide Rev. Fuller access to medically necessary care once Rev. Fuller arrived at Pulaski.[42]

91.    Doe Defendants 1–20, employed by Centurion, are the other medical officials and administrators who have delayed Rev. Fuller's access to surgery. By preventing Rev. Fuller from receiving a surgical consult for over two years after his facility recommended it, with no clear explanation, Doe Defendants 1–20, Centurion's Gender Dysphoria Committee, have shown indifference towards Rev. Fuller's serious medical needs. Their violations are continuous and ongoing.[43]

92.    GDC's blanket ban—which all of the named Defendants adopted, enforced, and implemented—has caused Rev. Fuller to suffer serious injuries,

---

[41] *See supra* ¶ 54.

[42] *See supra* ¶ 73.

[43] *See supra* ¶ 74.

including physical, mental and emotional suffering such as anxiety and depression, which have caused him sleeplessness and made him unable to eat.[44] In the seven-year period that Defendants have unjustifiably refused to provide Rev. Fuller medically necessary and life-saving gender-affirming surgery, Rev. Fuller continues to suffer physically, mentally, and emotionally. GDC's blanket ban policy enforced by Defendants has thus caused Rev. Fuller grievous—yet entirely preventable—harm.

## Count 2

### Title II of the Americans with Disabilities Act – Disability Discrimination/Failure to Accommodate
### Injunctive Relief and Damages
### (Against Defendant GDC)

93.    Under Title II of the ADA, a public entity may not deny a qualified individual with a disability the opportunity to participate in or benefit from a service, program, or activity. Title II also requires covered parties to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in the benefits administered by these parties under the ADA.

---

[44] *See supra* ¶ 78.

94.    A "disability" under the ADA and the ADA Amendments Act of 2008 ("ADAAA") is "a physical or mental impairment that substantially limits one or more major life activities."[45]

95.    Rev. Fuller is a qualified individual with a disability. Rev. Fuller suffers from multiple mental impairments including gender dysphoria, depression, and anxiety. Rev. Fuller's gender dysphoria substantially limits his ability to perform major life activities, including sleeping, eating, thinking, and concentrating.[46] He is often overwhelmed by thoughts of his body's misalignment with his gender. His underlying anxiety and depression are both exacerbated by his gender dysphoria.[47]

96.    GDC is currently, and at all relevant times was, a "public entity" as defined by the ADA[48] and provides a "program," "service," or "activit[y]" within the meaning of the ADA, including correctional and rehabilitative programs and services.[49] GDC denied Rev. Fuller the benefits of GDC's services when GDC officials, including Defendants Lewis, Sauls, and Mardis, delayed Rev. Fuller's

---

[45] 42 U.S.C. § 12102(1)(A).

[46] *Id.* § 12102(2)(A); *see supra* ¶ 78.

[47] *See supra* ¶¶ 40, 50.

[48] 42 U.S.C. § 12131(1)(B).

[49] *Id.* § 12131(2).

surgical evaluation as recommended by his mental health clinicians in the prison system.[50]

97.    GDC's refusal to provide access to its medical services was by reason of Rev. Fuller's specific disability. People with other disabilities and medical needs do not face the same barriers to accessing surgical care within GDC. GDC has effectively denied Rev. Fuller his surgical evaluation through undue delay of over two years because of GDC's unconstitutional blanket ban that applies only to transgender individuals seeking gender dysphoria care, including gender-affirming surgery. GDC's blanket ban on gender-affirming surgery has no medical basis. This determination was not based on an individualized assessment of Rev. Fuller's medical needs but instead solely on Rev. Fuller's gender dysphoria. Therefore, the blanket ban is discriminatory, which is prohibited by the ADA.

98.    Accessing gender-affirming surgery is a reasonable accommodation. Rev. Fuller requires this reasonable accommodation to GDC's blanket ban against providing gender-affirming surgeries because of the mental illnesses caused by his disability (gender dysphoria) and the risk to his health and safety that will result without proper treatment.

---

[50] *See supra* ¶¶ 51, 52, 54, 63.

99.    GDC did not engage in the individualized assessment required by SOP 507.04.68 to arrive at appropriate alternatives, if any, and instead simply enforced the blanket ban. Rev. Fuller's mental health evaluations show the strong need for access to these medical services as a reasonable accommodation to GDC's policy.[51] For Rev. Fuller, top surgery is medically necessary and GDC's denial of this gender-affirming care is a denial of treatment in total.

100.    Further, access to gender-affirming surgery is a reasonable accommodation that would alleviate Rev. Fuller's gender dysphoria distress that impairs his ability to participate in basic life activities.

101.    GDC's blanket ban—which all of the named Defendants adopted, enforced, and implemented—has caused Rev. Fuller to suffer serious injuries. In the entire seven-year period that Defendants have unjustifiably refused to provide Rev. Fuller medically necessary and life-saving gender-affirming surgery, Rev. Fuller continues to suffer physically, mentally, and emotionally. GDC's discriminatory and illegal blanket ban policy has thus caused Rev. Fuller grievous—yet entirely preventable—harm.

---

[51] *See supra* ¶¶ 52–55.

**Count 3**

**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 – Disability Discrimination**
**Injunctive Relief and Damages**
**(Against Defendant GDC)**

102.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability in any program or activity receiving federal assistance. Section 504 also requires covered parties to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in the benefits administered by the covered parties.[52] A "disability" under the Rehabilitation Act, which shares the ADA's definition, is "a physical or mental impairment that substantially limits one or more major life activities."[53]

103.    Rev. Fuller is a qualified individual with a disability. Rev. Fuller suffers from multiple mental impairments, including gender dysphoria, anxiety, and depression. Rev. Fuller's gender dysphoria substantially limits his ability to perform major life activities, including sleeping, eating, thinking, and concentrating.[54] He is often overwhelmed by thoughts of his body's misalignment with his gender. His underlying anxiety and depression are both exacerbated by his gender dysphoria.[55]

---

[52] 35 C.F.R. § 104.12(a).
[53] 42 U.S.C. § 12101(1); 29 U.S.C. § 705(9)(B) (noting that "disability" is given the same meaning as in 42 U.S.C. § 12101).
[54] 42 U.S.C. § 12102(2)(A).
[55] *See supra* ¶¶ 40, 50.

104.   GDC receives federal financial assistance for its operation of programs and activities.[56]

105.   GDC is currently, and at all relevant times was, a "public entity" as defined by the Rehabilitation Act[57] and provides a "program," "service," or "activit[y]" within the meaning of the Rehabilitation Act, including correctional and rehabilitative programs and services.[58]

106.   Through its undue delay of over two years, GDC effectively denied Rev. Fuller the benefits of GDC's services when GDC officials, including Defendants Sauls, Lewis, and Mardis, refused to provide Rev. Fuller the surgical evaluation recommended by his mental health clinicians in the prison system.[59]

107.   GDC's denial of its medical services was by reason of Rev. Fuller's specific disability. People with other disabilities and medical needs do not face the same barriers to accessing surgical care. GDC has refused to provide Rev. Fuller his surgical evaluation because of GDC's unconstitutional blanket ban that applies only to transgender individuals seeking gender dysphoria care, including gender-affirming surgery. GDC's blanket ban on gender-affirming surgery has no medical basis. This determination was not based on an individualized assessment of Rev.

---

[56] *See supra* ¶ 14.
[57] 42 U.S.C. § 12131(1)(B).
[58] *Id.* § 12131(2).
[59] *See supra* ¶¶ 51, 52, 54, 63.

Fuller's medical needs but instead solely on Rev. Fuller's gender dysphoria. Therefore, the blanket ban is discriminatory, which is illegal under the Rehabilitation Act.

108.    Accessing gender-affirming surgery is also a reasonable accommodation. Rev. Fuller requires this reasonable accommodation to GDC's blanket ban against providing gender-affirming surgeries because of the mental illnesses caused by his disability (gender dysphoria) and the risk to his health and safety that will result without proper treatment, including an exacerbation of his symptoms of anxiety and depression, which have limited his major life activities of sleeping, eating, thinking, and concentrating.[60]

109.    GDC did not engage in the individualized assessment required by SOP 507.04.68 to arrive at appropriate alternatives, if any, and instead simply enforced the blanket ban. Rev. Fuller's mental health evaluations show the strong need for access to these medical services as a reasonable accommodation to GDC's policy. For Rev. Fuller, top surgery is medically necessary, and GDC's undue delay of that gender-affirming care is effectively a denial of treatment in total.[61]

---

[60] *See supra* ¶ 78.
[61] *See supra* ¶¶ 55, 74.

110.   Further, access to gender-affirming surgery is a reasonable accommodation that would alleviate Rev. Fuller's gender dysphoria distress, which impairs his ability to participate in basic life activities.

111.   GDC's blanket ban—which all the named Defendants adopted, enforced, and implemented and which violates the Rehabilitation Act—has caused Rev. Fuller to suffer serious injuries that have manifested physically, emotionally, and mentally. GDC's discriminatory and illegal blanket ban policy has thus caused Rev. Fuller grievous—yet entirely preventable—harm.

## Count 4

### Title III of the Americans with Disabilities Act – Disability Discrimination Injunctive Relief and Damages (Against Defendant Centurion)

112.   Title III of the ADA prohibits discrimination by private entities in places of public accommodation.[62] Title III also requires covered parties to provide "reasonable modifications in policies, practices, or procedures" for individuals with disabilities so they can fully participate in the benefits administered by the covered parties under the ADA.[63]

---

[62] 42 U.S.C. § 12182(a).
[63] *Id.* § 12182(b)(2)(A)(ii).

113.    A "disability" under the ADA and the ADAAA is "a physical or mental impairment that substantially limits one or more major life activities."[64]

114.    Rev. Fuller is a qualified individual with a disability. Rev. Fuller suffers from multiple mental impairments, including gender dysphoria, anxiety, and depression. Rev. Fuller's gender dysphoria substantially limits his ability to perform major life activities, including sleeping, eating, thinking, and concentrating.[65] He is often overwhelmed by thoughts of his body's misalignment with his gender. His underlying anxiety and depression are both exacerbated by his gender dysphoria.[66]

115.    Defendant Centurion is a private entity that provides medical services in GDC facilities, including Arrendale and Pulaski, which are places of public accommodation. Centurion therefore operates places of public accommodation.

116.    Defendant Centurion employs some of the staff who oversee, review, and determine Rev. Fuller's gender-affirming care needs, including Defendant Noe and Doe Defendants 1–20, the members of Centurion's Gender Dysphoria Committee.[67]

---

[64] *Id.* § 12101(1).

[65] 42 U.S.C. § 12102(2)(A).

[66] *See supra* ¶¶ 40, 50.

[67] *See supra* ¶¶ 20–21, 55, 73.

117.    Defendant Noe and Doe Defendants 1–20 have refused to provide Rev. Fuller access to medical services by reason of Rev. Fuller's disability.[68] People with other disabilities and medical needs do not face the same barriers to accessing surgical care within GDC and from Defendant Centurion. Defendant Noe and Doe Defendants 1–20 have refused to provide Rev. Fuller a surgical evaluation because of GDC's blanket ban that applies only to gender-affirming surgery. This ban on gender-affirming surgery has no medical basis. This determination was not based on an individualized assessment of Rev. Fuller's medical needs but instead solely on Rev. Fuller's gender dysphoria. Therefore, this blanket ban is discriminatory, which is illegal under the ADA.

118.    Accessing gender-affirming surgery is also a reasonable accommodation. Rev. Fuller requires this reasonable accommodation to GDC's blanket ban against providing gender-affirming surgeries because of the mental illnesses caused by his disability (gender dysphoria) and the risk to his health and safety that will result without proper treatment, including an exacerbation of his symptoms of anxiety and depression, which have limited his major life activities of sleeping, eating, thinking, and concentrating.

---

[68] *See supra* ¶¶ 73, 74.

119.    Since July 1, 2024, Defendant Centurion and its employees, Defendant Noe and Doe Defendants 1–20, Centurion's Gender Dysphoria Committee, have not engaged in an individualized assessment of Rev. Fuller as required by SOP 507.04.68 to arrive at appropriate alternatives, if any, and instead have simply enforced the blanket ban. Rev. Fuller's mental health evaluations show the strong need for access to these medical services as a reasonable accommodation to GDC's policy. For Rev. Fuller, a mastectomy is medically necessary, and Defendant Centurion's refusal to provide that gender-affirming care is a denial of treatment in total.

120.    GDC's blanket ban—which Centurion has adopted, enforced, and implemented since it began its contract with GDC in July 1, 2024—has caused Rev. Fuller to suffer serious injuries. Because Defendant Centurion and its employees, including Defendant Noe and Doe Defendants 1–20, have unjustifiably refused to provide Rev. Fuller medically necessary and life-saving gender-affirming surgery, Rev. Fuller continues to suffer physically, mentally, and emotionally. He has had trouble sleeping and at times his anxiety has prevented him from eating. His increased anxiety and depression have been exacerbated by GDC's failure to provide him with access to medical services that would help to accommodate his gender dysphoria. GDC's blanket ban policy enforced by Defendant Centurion has thus caused Rev. Fuller grievous—yet entirely preventable—harm.

**Count 5**

**42 U.S.C. § 1983 – Equal Protection – Deprivation of Equal Protection in Violation of the Fourteenth Amendment of the Discrimination on the Basis of Sex or Gender Identity**
**Injunctive Relief and Damages**
**(Against Defendants GDC, Centurion, Sauls in his official capacity, Defendant Mardis in her official and individual capacities, and Defendant Lewis in her individual capacity)**

121.   The Fourteenth Amendment to the United States Constitution, enforceable against Defendants pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any persons within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1.

122.   Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex, including discrimination based on transgender status, is presumptively unconstitutional and is subject to heightened scrutiny.[69]

123.   By delaying and refusing to provide Rev. Fuller medically necessary surgical care, despite providing that same treatment to women with other medical needs,[70] Defendants GDC, Centurion, Sauls, Mardis, and Lewis have treated Rev. Fuller differently from similarly situated prisoners in violation of the Equal Protection Clause.

---

[69] *See generally Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020).

[70] *See supra ¶¶ 7, 66.*

43

124.   GDC has discriminated against Rev. Fuller based on his sex and his transgender status in two different ways. First, GDC has provided the exact same surgery—subcutaneous mastectomy, which is a breast reduction surgery—to at least three other incarcerated women to treat their breast cancer. Rev. Fuller is similarly situated to these women. The procedure is the same. It is just as invasive, involves similar risks, requires the same length of recovery, and costs the same amount. The only reason Defendants GDC, Centurion, Sauls, Mardis, and Lewis agreed to provide it for the women and not Rev. Fuller is Rev. Fuller's sex and his transgender status. Women with breast cancer could receive a subcutaneous mastectomy, but Rev. Fuller, a transgender man treating his gender dysphoria, cannot.

125.   GDC also discriminated against Rev. Fuller by denying him top surgery despite providing those same three women chest reconstructive surgery to return their body to a feminized figure after receiving a mastectomy for breast cancer. In other words, GDC provided gender affirming care so that women whose gender identify is female could have their bodies appear feminine. Rev. Fuller is similarly situated to these women. Although a different procedure, the surgery serves the precisely same purpose as Rev. Fuller's top surgery: to align their bodies with their gender. The only difference is that Rev. Fuller is a man seeking a surgery to look more like a man, whereas the women received chest reconstructive surgeries to look more like women. This different treatment is blatant sex discrimination. Cisgender

women could receive chest reconstructive surgery, whereas Rev. Fuller, a transgender man, cannot.

126.  By refusing to provide Rev. Fuller with the same medical procedure that women in Pulaski and Arrendale received, Defendants GDC, Centurion, Sauls, Mardis, and Lewis discriminated—and continue to discriminate—against Rev. Fuller on the basis of sex and transgender status, which are subject to heightened scrutiny under the Equal Protection Clause.

127.  Discrimination against transgender people, like Rev. Fuller, because of their sex or transgender status bears indicia of a suspect classification requiring heightened scrutiny by courts because of the following:

   a. Transgender people have suffered a long history of extreme discrimination and continue to suffer as a result of such discrimination, even to this day;

   b. Transgender people, especially those that are in the custody of GDC, are a politically vulnerable minority;

   c. Transgender people as a class have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society; and

   d. Transgender people are a class of people exhibiting immutable or distinguishing characteristics that define them as a discrete group.

128.   Transgender people have historically been subject to discrimination in Georgia and across the country and remain a very small minority of the American population that lacks political power.

129.   Gender identity is a core, defining trait that cannot be changed voluntarily or through medical intervention and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

130.   Defendants GDC's, Centurion's, Sauls's, Mardis's, and Lewis's discrimination against Rev. Fuller is not narrowly tailored to advance a compelling government interest.

131.   Defendants GDC's, Centurion's, Sauls's, Mardis's, and Lewis's discrimination against Rev. Fuller is not substantially related to any important government interest.

132.   Defendants GDC's, Centurion's, Sauls's, Mardis's, and Lewis's discrimination against Rev. Fuller is not related to any legitimate government interest.

133.   Defendants GDC, Centurion, Sauls, Mardis, and Lewis have prohibited medically necessary care for Rev. Fuller based on generalized fears, negative attitudes, stereotypes, and moral disapproval of trans people, which are not legitimate bases for unequal treatment under any level of scrutiny.

134.    Refusing to provide Rev. Fuller critical and medically necessary care—despite its own providers' recommendations for Rev. Fuller to receive that care—demonstrates Defendants GDC's, Centurion's, Sauls's, Mardis's, and Lewis's discriminatory blanket ban on providing gender-affirming surgeries to transgender people in its custody when it will provide those surgeries to cisgender people in its custody. The blanket ban thus violates of the Equal Protection Clause.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A.    Enter judgment in favor of Plaintiff and against Defendants on each of the counts in this Complaint.

B.    Issue permanent injunctive relief against Defendants by ordering Defendants to meet medical standards for Plaintiff's medically necessary gender-affirming care and provide Plaintiff with reasonable accommodations for his gender dysphoria, including but not limited to ordering Defendants to:

(1)    Allow Plaintiff to meet and consult with surgeons who can provide the gender-affirming surgeries recommended by his clinicians; and

(2)    Direct that Rev. Fuller receive the mastectomy recommended in the evaluations by 60 days after judgment has been entered in the case.

C.    Award Plaintiff compensatory and punitive damages for his physical injuries and his pain and suffering caused by the delay and the past refusal to provide him with gender-affirming surgery.

D.    Award Plaintiff costs and reasonable attorney's fees as allowed by law.

E.    Grant any other relief this Court deems just, equitable, and proper.

[SIGNATURES ON FOLLOWING PAGE]

Respectfully submitted this 17th day of January, 2025.

*/s/ Matthew R. Sellers*

Amanda Kay Seals
Ga. Bar No. 502720
Matthew R. Sellers
Ga. Bar No. 691202
Bondurant, Mixson & Elmore, LLP
1201 W. Peachtree St., Ste. 3900
Atlanta, GA 30309
Tel: 404-881-4100
Fax: 404-881-4111
sellers@bmelaw.com

Sarah D. Gordon
Steptoe LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone:  (202) 429-8005
Fax:  (202) 429-3902
Email:  *Sgordon@steptoe.com*

D Dangaran
Miriam R. Nemeth
Rights Behind Bars
1800 M St. NW Fnt. 1 #33821
Washington, D.C. 20033
(202) 455-4399
d@rightsbehindbars.org
miriam@rightsbehindbars.org